| | |
|---|---|
| GERALD GLASNER, | ) |
|     *Plaintiff*, | ) Case No. 4:18-cv-41 |
| v. | ) Judge Travis R. McDonough |
| | ) Magistrate Judge Susan K. Lee |
| PROTECTIVE STRATEGIES, INC.[1] and AKIMA SUPPORT OPERATIONS, INC., | ) |
|     *Defendants*. | ) |

## MEMORANDUM OPINION

Before the Court are cross-motions for summary judgment filed by Defendant Protection Strategies, Inc. ("PSI") and Plaintiff Gerald Glasner (Docs. 27, 31). Also before the Court is PSI's motion to strike Glasner's reply brief (Doc. 34). For the following reasons, PSI's motion for summary judgment (Doc. 27) will be **GRANTED IN PART** and **DENIED IN PART**, Glasner's cross-motion for summary judgment (Doc. 31) will be **DENIED**, and PSI's motion to strike (Doc. 34) will be **DENIED AS MOOT**.

### I. BACKGROUND

Plaintiff Gerald Glasner worked as a Protective Services Dispatcher ("Dispatcher") at Arnold Air Force Base ("AAFB") until PSI terminated him in 2017. (Doc. 28-2.) Glasner asserts that PSI engaged in unlawful disability and age discrimination in violation of the Age

---

[1] In his complaint, Plaintiff Gerald Glasner named "Protective Strategies, Inc." as a defendant. In its pleadings, however, this Defendant refers to itself as "Protection Strategies, Inc." Accordingly, the Court will refer to it as "Protection Strategies, Inc."

Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111 *et seq.* when it fired him. (*See generally* Doc. 22.)

As part of operating AAFB, the United States Air Force ("USAF") contracts out certain protective services. (*See* Doc. 28-24, at 1.) Glasner started working in protective services at AAFB in 1982. (Doc 28-32, at 21.) Until 2015, Glasner worked for Aerospace Testing Alliance ("ATA"), a company that provided protective services under contract with the USAF at AAFB. (*Id.* at 21–22.) In 2015, the USAF awarded Defendant Akima Support Operations, Inc. ("Akima") a contract to provide protective services and other support services at AAFB. (Doc. 28-24, at 1.) Akima, in turn, subcontracted with PSI to provide certain protective services at AAFB. (*Id.*; Doc. 28-27, at 7–10; Doc. 28-32, at 22; Doc. 28-53, at 7–8.) When the USAF awarded the protective-services contract to Akima, PSI retained several ATA employees working at AAFB, including Glasner. (Doc. 28-24, at 1; Doc. 28-32, at 22–23.)

PSI's Protective Services Officers ("PSOs") at AAFB helped enforce federal laws and Department of Defense and USAF regulations. (Doc. 28-24, at 2.) They also responded to emergencies, disturbances, and alarms at AAFB. (*Id.*)

PSO's had to meet certain physical fitness standards. (*See* Doc. 28-25, at 5.) According to the Performance of Work Statement ("PWS") provided by the USAF, Akima and PSI were required to "adhere to Physical Fitness Standards (PFS) for Protective Services personnel." (*Id.*) Specifically, the PWS states:

> Incumbent personnel will be "grandfathered" under the PFS covered in the International Guards Union of America (IGUA) CBA for the period of 1 year from contract start date. All Protective Services personnel hired after contract start date will be the Government stipulated PFS as a condition of performing Protective Services duties. Effective 1 October 2016 all personnel shall meet the government stipulated PFS in order to perform Protective Services duties at AEDC Arnold AFB. Government Stipulated PFS (Initially/Annually): Phases:

Situps (15 repetitions), push-ups (21 repetitions), and 1.0 mile run/walk (<12 minutes).

Performance Standards

a) Protective Services personnel must successfully pass all phases of the PFS in order to perform guard duties.

b) Guards that do not successfully pass the PFS will be afforded a second attempt to successfully pas the PFS within 30 days. If the individual fails to successfully pass the PFS on the second attempt the individual will not be authorized to perform Protective Services duties on AEDC Arnold AFB.

(*Id.*) The union representing the PSOs adopted these standards. (Doc. 28-34, at 31.) The International Guards Union, Local 46 (the "Union"), the bargaining representative for non-supervisory PSOs at AAFB, entered into a new collective bargaining agreement (the "CBA") with PSI, effective December 1, 2016. (*See id.*) The CBA adopted the USAF physical fitness standards and specified that, "all employees must pass the government stipulated PFS [Physical Fitness Standards] during their initial new hire or annual re-evaluation in order to perform Security Force duties at AEDC Arnold AFB." (*Id.* at 31.) An employee who failed any part of the physical fitness standards would not "be authorized to perform Security Force duties on AEDC Arnold AFB." (*Id.*)

Based on these requirements, Jason Morrow, Chief of Staff for PSI, avers that satisfying the physical fitness standards was required for a PSO to be armed and to perform their duties at AAFB. (Doc. 28-24, at 2.) Other PSOs testified they understood compliance with the physical fitness standards was a requirement for employment as a PSO at AAFB. (Doc. 28-16, at 12; Doc. 28-17, at 7–8, 10.) Morrow further avers that PSI had no authority to omit or modify the USAF-mandated physical fitness standards. (Doc. 28-24, at 4.) Glasner, however, disputes that meeting the physical fitness standards was required to carry a weapon at AAFB. (Doc. 28-32, at 47–48.) Glasner, as well as other current and former PSOs, testified that, to carry a weapon, a

3
Case 4:18-cv-00041-TRM-SKL   Document 39   Filed 08/03/20   Page 3 of 19   PageID #: 1901

PSO only had to be of good character, pass a weapons and "use of force" class, and qualify with his weapon, none of which required meeting the specified fitness standards. (*Id*.; Doc. 28-16, at 33–35; *see also* Doc. 28-53, at 24.)

When PSI began providing protective services at AAFB in 2015, Glasner was a "Field Training Supervisor (Lead)." (Doc. 28-32, at 10–13, 54–56.) Glasner was responsible for outside field protective services and dispatch in the operation of the Base Defense Operations Center ("BDOC"). (*Id*.; *see also* Doc. 28-17, at 11.) Glasner was also responsible for ensuring all personnel were mentally and physically fit for duty before issuing them a firearm. (Doc. 28-32, at 54–56.)

In 2017, PSI engaged in discussions with the USAF and the Union regarding reclassification of the "lead" positions that supported dispatch operations. (*See* Doc. 28-37.) On February 15, 2017, Dan Webb, Operations Manager for PSI, and Don Miller, Project Manager for PSI, sent a letter to Orville Glenn, President of the Union, summarizing their meeting regarding "Completion of the Reclassification of dispatch leads." (*Id*.) In the letter, Webb and Miller stated:

> The [Union] non-concurred with making the weapons qualification and Physical Fitness requirements an option for the BDOC Leads who assume the position on March 5, 2017. The current contract Performance Work Statement (PWS) does not require "dispatchers" (identified as Leads in the CBA) to be armed in the performance of their duties. This is not a negotiable item with the [Union] and PSI is making an operational decision to provide Leads with the opportunity to remain qualified to carry a firearm and meet the Physical Fitness Requirements or chose to no longer meet the requirements to be armed. This option will not affect the current pay rate or benefits for these personnel.

(Doc. 28-37, at 1.) Additionally, a job description for the reclassified Dispatcher position, which was attached to Webb and Miller's letter, stated that an applicant "[m]ust maintain qualification with assigned weapons and maintain authorization to be armed," but it did not state that meeting any physical fitness standards was required. (*Id*. at 3–4.) Even a portion of the job description

entitled "Determination of Essential Functions" did not suggest that passing a physical fitness test was required. (*Id*. at 4–5.)

On March 5, 2017, Glasner's title changed, and he became a Dispatcher assigned to the BDOC. (*Id*. at 61–63, 81–85.) According to a job description dated March 14, 2017, a Dispatcher's primary responsibilities include, among other things, to "[e]nsur[e] rapid implementation of the security reporting, alerting and communications systems and implementation of security operations," and to "dispatch protective services personnel to ensure immediate response, containment and investigation of routine and emergency situations." (Doc. 28-57, at 1–2.) In addition to these responsibilities, other PSOs testified that Dispatchers had to support other on-duty PSOs, which required them to perform guard duties and fill in as a field PSO when needed due to a shortage of staff. (Doc. 28-16, at 15–16; Doc. 28-17, at 27–28.) As one PSO testified: "They're — They're officers just like we are. They're — They're able to perform other duties than dispatchers. They could work Test Post. They could work gates. They could work outside patrols, inside patrols because basically they all got complete security clearance. . . . They're officers just like I am." (Doc. 28-17, at 27–28.) When asked how a physical fitness test related to a Dispatcher's job, Webb testified that a Dispatcher "may have to respond depending on a situation and response could require . . . taking cover" and "long periods of running." (Doc. 28-53, at 33.) Despite this testimony, Webb conceded that he was not aware of any prior incident at AAFB which required Dispatchers to respond and also testified that completing fifteen sit-ups, twenty-one push-ups and a one-mile run was not related to any of responsibilities listed on the Dispatcher job description. (*Id*. at 33–39.) Glasner also disputes that Dispatchers were required to perform field officer responsibilities or guard duties. (Doc. 28-32, at 77–81.) Although Glasner agrees that Dispatchers were primarily responsible for

dispatching protective services personnel to ensure immediate response, containment, and investigation of emergency situations, he testified that he performed those responsibilities from the BDOC office. (*Id.*) According to Glasner, he "would absolutely be the last person to respond to anything" because the Dispatcher was the "center point" who has to stay at the office to coordinate an appropriate response to any situation that arose. (*Id.*)

On March 29, 2017, Glasner attended his annual physical exam, which included the physical fitness test. (*See* Doc. 28-41.) At the exam, Glasner provided a letter from his personal physician, Dr. Paul McCombs, stating:

> This letter is in regards to your permanent restrictions regarding your lumbar spinal condition. You may run or jog no more than one mile, but you may not do push-ups or sit-ups during physical fitness training. I feel this may cause further flare up or even injury you [sic] spine.

(Doc. 28-19, at 13–14; Doc. 28-21; Doc. 28-32, at 97–104; Doc. 28-40.)[2] Upon verification that Glasner was not cleared to perform the fitness test, PSI declared him unfit for duty, even though he had no prior disciplinary incidents or performance or attendance issues. (Doc. 28-1, at 12–13; Doc. 28-6; Doc. 28-27, at 13, 29; Doc. 28-53, at 9, 33–34, 75–76.) In addition to the restrictions stated in his March 21, 2017 letter, Dr. McCombs testified that Glasner's restrictions included:

> repetitive lifting, twisting, bending, stooping; shouldn't lift in excess of 20 pounds on any occasion or 10 pounds repetitively. He could sit up for four hours a day, stand up for two hours, walk up to two hours with breaks, would require approximately four breaks a day at 10 to 15 minutes.

(Doc. 28-19, at 12–13; *see also* Doc. 28-20, at 17.)

On March 31, 2017, Glasner contacted Tina Davis, PSI's human resources manager, and requested information regarding short-term disability benefits under the CBA. (Doc. 28-32, at

---

[2] In October 2001, before Glasner began working for PSI, his doctors performed surgery on his back, fusing his L4 and L5 vertebrae. (*See* Doc. 28-20, at 1, 4.)

108–09; Doc. 28-42.) After receiving Glasner's application for disability benefits, Davis forwarded his application to Lincoln Financial Group ("Lincoln"), the company that issued the insurance policy and was responsible for making benefits decisions under the policy. (Doc. 28-32, at 109, 113; Doc. 28-43.) Glasner's application for disability benefits included a form completed by Dr. McCombs stating that "[p]ermanent restrictions placed on patient that do not allow patient to return to work" and noting that Glasner's job may not be modified to allow him to return to work. (Doc. 28-43, at 4.)

Lincoln approved Glasner for short-term disability benefits on May 12, 2017, but only through June 1, 2017, stating that date represented the recovery period that "has been suggested by your physician or the usual and customary recovery period for your disability and occupation." (Doc. 28-44.) As a result, Davis e-mailed Glasner on May 22, 2017, telling him to return to work on June 1, 2017. (*Id.* at 1.) She advised him that if he was unable to return to work, he had to provide medical documentation to support his continued disability. (*Id.*) After not receiving a response, Davis again e-mailed Glasner on May 29, 2017:

> I have not received any new medical documentation from [you or your doctor]. You are due to return to work on 6/1/2017, however before you can return I will need a medical release from your physician stating that you are fit to return to work. Please provide this no later than 5/31/2017. If you have any questions please feel free to contact me.

(Doc. 28-45, at 1.) Glasner responded:

> Ms. Davis: I have no new medical documentation to send. Please read the attached (word format) letter I am sending to Lincoln Financial Tuesday May 30. This should clarify any misunderstanding as to why I will not be returning to work June 1.

(*Id.*) The letter directed to Lincoln states, in relevant part:

> I have a serious medical condition that will not allow me to perform the substantial and material duties (essential functions) of my normal occupation as determined by the United States Air Force, my employer Protection Strategies, Inc. (PSI), the employer's medical staff Urgent Team in Tullahoma, Tn. and my

7

> personal physician Dr. Paul McCombs at Howell Allen Clinic, Nashville, Tn. . . . The medical conditions I have are permanent, degenerative in nature, and will only progress over time. I am receiving the Epidural Steroid Injections to help alleviate pain and discomfort; the injections are not a cure, additional surgery is not recommended . . . The Physical Fitness program is a condition of employment and is an essential function.

(*Id*. at 2.) On May 31, 2017, Davis responded to Glasner's e-mail:

> Unfortunately, this letter does not provide us with the medical documentation that is required to either return to work or to continue with your disability. If your intent is to continue your disability status, we will need a doctor's note stating that you are unable to return to work. In addition, if no doctor's note is received and all [paid time off] has been exhausted your absences will be considered unexcused and are subject to administrative review and or disciplinary action.

(Doc. 28-46.)

When Glasner did not return to work on June 1, 2017, PSI placed him on paid time off pending receipt of additional information from his doctor or reconsideration by Lincoln of his eligibility for additional disability benefits. (*See* Doc. 28-1, at 54–57.) Glasner's paid time off ran out on June 16, 2017, and he did not provide PSI with any additional medical information. (*Id*.) On June 16, 2017, Glasner sent another e-mail to Davis reiterating that his restrictions were "permanent" and stating that Dr. McCombs "is not going to issue a note releasing me to return to work." (Doc. 28-48, at 1.)

On June 23, 2017, Davis again e-mailed Glasner noting that PSI had not received any additional documentation from Dr. McCombs and requesting that Glasner provide PSI with medical information to support his continued disability leave. (Doc. 28-49, at 1.) Glasner provided no additional information in response to this request, but, on June 27, 2017, Glasner notified Davis that Lincoln denied his request for additional disability benefits. (*Id*.)

After receiving Glasner's email, Davis met with Morrow and Webb to discuss Glasner's situation. (Doc. 28-1, at 14–16; Doc. 28-2.) In a memorandum dated June 27, 2017, Davis, Webb, and Morrow recommended terminating Glasner because he was unable "to complete the

mandatory physical fitness test and return to work" and because he failed to provide additional medical documentation supporting his disability claim. (Doc. 28-2, at 2). Glasner disputes that he failed to provide adequate medical information to support his continued leave, because his May 8, 2017 email with Davis and Webb described permanent restrictions that prevented him from returning to work. (Doc. 28-27, at 30–31; Doc. 31-2, at 377–80.)

PSI terminated Glasner's employment on July 11, 2017. (Doc. 28-3.) According to Davis, Webb, and Morrow, at the time of Glasner's termination, there were no open positions that did not require passing the USAF's physical fitness standards.[3] (Doc. 28-1, at 65; Doc. 28-27, at 58–59; Doc. 28-53, at 54-55.) According to Glasner, Jason Coffelt, a thirty-year-old man, replaced him as a Dispatcher on April 1, 2017. (Doc. 28-32, at 92.) Nonetheless, Glasner testified that he was unaware of any information suggesting that age was a factor in his termination. (*Id*. at 204.)

Glasner initiated the present action June 29, 2018 (Doc. 1), and filed an amended complaint on November 1, 2018 (Doc. 22). In his amended complaint, Glasner asserts claims against PSI and Akima[4] for violations of the ADA and the ADEA. (*Id*. at 7–9.) PSI and Glasner have filed cross-motions for summary judgment on Glasner's claims (Docs. 27, 31), and those motions are now ripe for the Court's review.[5]

---

[3] In opposing PSI's motion for summary judgment, Glasner's counsel represents that Glasner "does not have adequate information to admit or dispute that, at the time of Plaintiff's termination, there were no open positions that did not require passing the Air Force's mandated physical fitness standards." (Doc. 31, at 8.)

[4] Glasner has named both PSI and Akima as defendants. (*See* Doc. 1.) Although Akima has been served (Doc. 11), it has not appeared or otherwise responded to Glasner's allegations against it.

[5] PSI has also filed a motion to strike Glasner's reply brief, arguing that it improperly raises a new argument for the first time in reply. (Doc. 34.) The Court need not resolve PSI's motion to strike, however, because Glasner's arguments in his reply brief do not impact the Court's

## II. STANDARD OF LAW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by pointing out the absence of support in the record for the nonmoving party's case. *Celotex*, 477 U.S. at 325. Once the movant has discharged this burden, the nonmoving party can no longer rest upon the allegations in the pleadings; rather, it must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).

At summary judgment, the Court may not weigh the evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the non-movant based on the record. *Id.* at 251–52; *Lansing Dairy,*

---

decision on the parties' cross-motions for summary judgment. Accordingly, PSI's motion to strike (Doc. 34) is **DENIED AS MOOT**.

*Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).  If not, the Court must grant summary judgment.  *Celotex*, 477 U.S. at 323.

The standard of review when parties file cross-motions for summary judgment is the same as when only one party moves for summary judgment.  *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).  When there are cross-motions for summary judgment, the court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  *Id*.  In considering cross motions for summary judgment, the court is "not require[d] . . . to rule that no fact issue exists."  *Begnaud v. White*, 170 F.2d 323, 327 (6th Cir. 1948).

## III. ANALYSIS

### A. Glasner's ADA Claim

The parties have filed cross-motions for summary judgment on Glasner's claim for disability discrimination under the ADA.  (Doc. 28, at 12–24; Doc. 31, at 12–24.)  PSI contends that the undisputed material facts demonstrate that Glasner's claim fails as a matter of law.  (Doc. 28, at 12–24.)  Conversely, Glasner contends that the undisputed facts demonstrate that he is entitled to summary judgment on his ADA claim.  (Doc. 31, at 12–24.)

The ADA forbids employers from discriminating against their employees based on an employee's disability.  42 U.S.C. § 12112(a); *see also Moorer v. Baptist Mem'l Health Care Sys.*, 398 F.3d 469, 479 (6th Cir. 2005).  "To recover on a claim for discrimination under the ADA, a plaintiff must show that he or she (1) is disabled, (2) is otherwise qualified to perform the essential functions of the position, with or without accommodation, and (3) suffered an adverse employment action because of his or her disability."  *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016).  A plaintiff asserting disability discrimination may prove his case

by presenting direct evidence of discrimination—that is, evidence that the employer "relied upon the plaintiff's disability in making its employment decision."[6] *Id*. In cases with direct evidence that the plaintiff suffered an adverse employment action because of his or her disability, the plaintiff "bears the burden of establishing that he or she is 'disabled'" and "'otherwise qualified' for the position despite his or her disability: a) without accommodation from the employer; b) with an alleged 'essential' job requirement eliminated; or c) with a proposed reasonable accommodation." *Id*. (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996)). "Once the plaintiff has established these elements, the employer "bear[s] the burden of proving that a challenged job criterion is essential . . . or that a proposed accommodation will impose an undue hardship upon the employer." *Id*.

Alternatively, a plaintiff may prove a claim for disability discrimination by offering indirect evidence of discrimination and proceeding under the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Ferrari*, 826 F.3d at 891. Under the *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case for disability discrimination by proffering evidence that: (1) he is disabled; (2) he was otherwise qualified, with or without an accommodation; (3) he suffered an adverse employment decision; (4) the defendant knew or had reason to know of his disability; and (5) the position remained open while Defendant sought other applicants. *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011). If the plaintiff satisfies his burden at the *prima facie* stage, the burden shifts to the defendant to

---

[6] "Direct evidence is evidence that, if believed, 'requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" *Thompson v. City of Lansing*, 410 F. App'x 922, 929 (6th Cir. 2011) (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003)). It is "evidence that proves the existence of a fact without requiring any inferences." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004) (citation omitted).

offer a legitimate, non-discriminatory reason for its adverse employment action against the plaintiff. *See Ferrari*, 826 F.3d at 894. If the defendant provides a legitimate explanation for the decision, then the burden shifts back to Plaintiff, who must then "introduce evidence that the proffered explanation is pretextual." *Id*. at 892; *Blazek v. City of Lakewood*, 576 F. App'x 512, 516 (6th Cir. 2014).

Under either standard, Glasner bears the initial burden of demonstrating that he was "qualified" to perform the essential functions of a Dispatcher with or without a reasonable accommodation. An employee is a "qualified individual" if he can perform the essential functions of his job with or without a reasonable accommodation. 42 U.S.C. § 12111(8). In determining whether a particular function is essential to a position, the ADA directs that:

> consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

*Id*. Additionally, federal regulations implementing and interpreting the ADA direct that the following non-exhaustive list of factors should be considered in determining whether a job function is essential to a position: (1) the employer's judgment; (2) the written job description; (3) the amount of time spent performing the function; (4) the consequences of not requiring performance of the function; (5) the work experience of past incumbents of the position; and (6) the current work experience of incumbents in similar jobs. 29 C.F.R. § 1630(n)(3); *Camp v. Bi-Lo, LLC*, 662 F. App'x 357, 361 (6th Cir. 2016). "Whether a job function is essential is a question of fact that is typically not suitable for resolution on a motion for summary judgment." *Keith v. Cty. of Oakland*, 703 F.3d 918, 926 (6th Cir. 2013).

In this case, genuine issues of material fact remain as to whether the fitness test set forth in the PWS was an essential function of the Dispatcher position. PSI has submitted evidence

13
Case 4:18-cv-00041-TRM-SKL    Document 39    Filed 08/03/20    Page 13 of 19    PageID #: 1911

suggesting that Dispatchers, like Glasner, were considered PSOs that had to perform all duties of a field officer, including responding to emergency situations at AAFB, even though they performed their primary responsibilities in an office. For example, other PSOs testified that Dispatchers had to perform guard duties and fill in as field PSOs when needed due to a shortage of staff. (Doc. 28-16, at 15–16; Doc. 28-17, at 27–28.) As one PSO testified, "They're officers just like we are." (Doc. 28-17, at 27–28.) When asked how a physical fitness test related to a Dispatcher's job, Webb testified that a Dispatcher "may have to respond depending on a situation and response could require . . . taking cover" and "long periods of running." (Doc. 28-53, at 33.) Such evidence suggests that PSI considered the fitness test an essential function because a certain level of physical fitness was required to respond to emergency situations and to otherwise provide protective services at a military installation. By contrast, Glasner has submitted evidence suggesting Dispatchers performed primarily administrative tasks in an office setting and were unlikely to physically respond to an emergency situation. For example, although Glasner agrees that Dispatchers were primarily responsible for dispatching personnel to ensure immediate response, containment, and investigation of emergency situations, he testified that he performed those responsibilities from the BDOC office and that he would not leave the office to perform these duties. (Doc. 28-32, at 77–81.) According to Glasner, he "would absolutely be the last person to respond to anything" because the Dispatcher is the "center point" who has to stay at the office to coordinate an appropriate response to any situation that arose. (*Id*.) Glasner's contention that the fitness standards are not essential functions is further corroborated by PSI's Dispatcher job description stating that a Dispatcher must be authorized to

14
Case 4:18-cv-00041-TRM-SKL   Document 39   Filed 08/03/20   Page 14 of 19   PageID #: 1912

carry a weapon but stating nothing about a physical fitness test.[7]  (Doc. 28-56, at 3–6.)
Moreover, when questioned about the Dispatcher job description, Webb testified that meeting the USAF physical fitness standards did not relate to any of the listed responsibilities.  (Doc. 28-53, at 33–39.)  Such conflicting evidence regarding the employer's judgment, the written job description, the amount of time spent performing particular duties, and the consequences of not requiring a physical fitness test demonstrate that genuine issues of material fact remain as to whether meeting the physical fitness standards was an essential function of the Dispatcher position and whether Glasner could perform the essential functions of the Dispatcher position, with or without a reasonable accommodation.[8]

PSI also argues that it is entitled to summary judgment because Glasner is unable to prove PSI's reason for terminating him was pretext for disability discrimination.  (Doc. 28, at 23–24.)  However, the pretext inquiry is inappropriate under the facts presented.  As the Sixth Circuit has explained, "[w]hen an employer acknowledges that it relied upon the plaintiff's handicap in making its employment decision . . . the *McDonnell Douglas* burden shifting approach is unnecessary because the issue of the employer's intent, the issue for which *McDonnell Douglas* was designed, has been admitted by the defendant . . . and the plaintiff has

---

[7] The parties have also presented conflicting evidence regarding whether passing the physical fitness test was a requirement to carry a weapon.  Morrow averred that satisfying the physical fitness standards was required for a PSO to be armed.  (Doc. 28-24, at 2.)  Glasner, as well as other current and former PSOs, however, testified that, to carry a weapon, a PSO only had to be of good character, pass a weapons and "use of force" class, and qualify with his weapon, none of which required meeting the specified fitness standards.  (*Id*.; Doc. 28-16, at 33–35; *see also* Doc. 28-53, at 24.)

[8] This remains true even though the physical fitness standards are set forth in the PWS issued by the USAF and even though Morrow averred that PSI did not have the authority to modify or excuse compliance with these standards.  While a jury could consider the PWS evidence that the physical fitness standards are an essential function of the Dispatcher position, PSI does not provide any authority suggesting that its inclusion in the PWS alone shields it from liability under the ADA or that it is dispositive with regard to the essential-function inquiry.

15
Case 4:18-cv-00041-TRM-SKL   Document 39   Filed 08/03/20   Page 15 of 19   PageID #: 1913

direct evidence of discrimination on the basis of his or her disability." *Ferrari*, 826 F.3d at 892 (quoting *Monette*, 90 F.3d at 1186).

In this case, PSI relied, at least in part, on Glasner's disability in deciding to terminate him. PSI argues that it terminated Glasner based on his unexcused absences after Lincoln denied additional disability benefits and after he exhausted his paid time off. But that argument ignores that PSI also declared Glasner unfit for duty because his back injury led to medical restrictions against performing sit-ups and push-ups for the physical fitness test. Indeed, Webb, Morrow, and Davis stated that they recommended terminating Glasner "due to his inability to complete the mandatory physical fitness test and return to work." (Doc. 28-2, at 2.) Such a statement is direct evidence that PSI relied on Glasner's disability, at least in part, in deciding to terminate him. As a result, the direct-evidence framework is more appropriate to resolve the parties' cross-motions for summary judgment. At a minimum, Webb, Morrow, and Davis's recommendation creates a genuine issue of material fact as to whether Glasner suffered an adverse employment action because of his disability. Accordingly, the Court will **DENY** the parties' cross-motions for summary judgment on Glasner's claim for disability discrimination under the ADA.

### B. Glasner's ADEA Claim

PSI has also moved for summary judgment on Glasner's claims for violation of the ADEA, arguing that the undisputed evidence demonstrates his claim for age discrimination fails as a matter of law.[9] (Doc. 28, at 24–25.) The ADEA prohibits an employer from failing or refusing to hire, discharging or discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age

---

[9] Unlike his claim for violation of the ADA, Glasner has not cross-moved for summary judgment on his claim for violation of the ADEA. (*See* Doc. 31, at 24–25.)

. . . ." 29 U.S.C. § 623(a)(1); *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009). "A plaintiff may establish a violation of the ADEA by either direct or circumstantial evidence." *Id.* "The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 264 (6th Cir. 2010) (citation and internal quotation marks omitted).

ADEA claims based on circumstantial evidence are also analyzed under the framework established in *McDonnell Douglas*.[10] *Geiger*, 579 F.3d at 622. Under the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case of age discrimination by proffering evidence that: (1) he was a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position held; and (4) he was replaced by someone outside of the protected class. *Id.* at 622. Alternatively, the plaintiff can satisfy the fourth prong of the *prima facie* case by providing evidence that similarly situated, non-protected employees were treated differently. *Moore v. AMPAC*, 645 F. App'x 495, 498 (6th Cir. 2016). "The burden of proof at the *prima facie* stage is minimal." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012) (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)); *see also Watson v. Ft. Worth Bank & Tr.*, 487 U.S. 977, 986 (1988) (noting in a disparate treatment case that "[t]he burden of proving a *prima facie* case is not onerous") (internal quotation marks omitted).

If the plaintiff is successful in satisfying the *prima facie* case, the defendant must then offer a legitimate, non-discriminatory reason that motivated the adverse employment action.

---

[10] Glasner does not argue that he has submitted any direct evidence of age discrimination. (*See* Doc. 31, at 24–25.)

*Schoonmaker*, 595 F.3d at 264.  Once the defendant provides a legitimate, nondiscriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reason was pretextual.  *Id*.  An employee can demonstrate pretext by providing evidence that the employer's reason for terminating him:  (1) had no basis in fact; (2) did not actually motivate the discharge; or (3) was insufficient to motivate the discharge.  *Segel v. Kimberly-Clark Corp.*, 473 F. App'x 416, 420 (6th Cir. 2012) (citing *Manzer v. Diamond Shamrock*, 29 F.3d 1078, 1084 (6th Cir. 1994)).

In this case, even assuming Glasner satisfied his burden at the *prima facie* stage, he has not demonstrated that genuine issues of material fact remain as to whether PSI's proffered reason for terminating him—his failure to return to work following denial of his claim for disability benefits and exhaustion of paid time off—was actually pretext for age discrimination.  In responding to PSI's motion, Glasner generally asserts that questions of fact remain as to his age-discrimination claim because he testified that "there had always been an aura out there that the old guys needed to move on."  (Doc. 28-32, at 203.)  But, Glasner also testified that he had no information to suggest that age was a factor in his termination (*id*. at 204), and Glasner's subjective beliefs are insufficient to create a genuine issue of material fact as to whether PSI's proffered reason for terminating him was pretext for age discrimination.  *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584 (6th Cir. 1992) (explaining that "subjective beliefs" are "wholly insufficient evidence to establish a claim of discrimination as a matter of law").  Glasner also suggests that genuine issues of material fact remain because, as of December 2015, there were five guys "who previously had lumbar fusion surgery" and only two of those individuals remain employed by PSI because one retired, one was denied disability benefits, and PSI declared him unfit for duty.  (Doc. 28-32, at 191–92).  This evidence, however, does not suggest that PSI's

proffered reason for terminating him was actually pretext for age discrimination. First, Glasner does not identify the ages of any of these individuals. Second, evidence that one individual voluntarily retired and one was denied disability benefits is insufficient to create a genuine issue of material fact as to whether PSI's reason for terminating him had no basis in fact, did not motivate his termination, or was insufficient to motivate his termination. Accordingly, the Court will **GRANT** PSI's motion for summary judgment on Glasner's claims for violation of the ADEA.

## IV. CONCLUSION

For the reasons stated herein, PSI's motion for summary judgment (Doc. 27) is **GRANTED IN PART** and **DENIED IN PART**. Glasner's claim for violation of the ADA is hereby **DISMISSED WITH PREJUDICE**. Glasner's cross-motion for summary judgment (Doc. 31) is **DENIED**, and PSI's motion to strike (Doc. 34) is **DENIED AS MOOT**.

**SO ORDERED.**

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**